Filed 4/18/16  P. v. Peacock CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C070068 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F07374) |
| v. | |
| JAMES PEACOCK, | |
| Defendant and Appellant. | |

Defendant James Peacock appeals after being convicted of first degree burglary (Pen. Code, § 459[1] (count one)), petty theft (§ 484 (count two -- lesser included offense to first degree robbery)), assault with a firearm (§ 245, subds. (a)(2) (count three)), assault with a deadly weapon, a knife (§ 245, subds. (a)(1) (count four)), felon in possession of a firearm (§ 12021, subd. (a)(1) (count six)), with true findings on enhancements for personal use of a firearm (§ 12022.5, subd. (a)(1)) and personal

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

infliction of great bodily injury (GBI) (§ 12022.7, subd. (a)).  He was sentenced to an aggregate term of 31 years 4 months.

On appeal, defendant contends:  (1) there was insufficient evidence he personally inflicted GBI; (2) the trial court erred by instructing the jury on " 'group beating' "; (3) the trial court violated the dual use prohibition when sentencing defendant to the upper term on the first degree burglary charge and the firearm use enhancement; and (4) the disparate sentence imposed on defendant compared to the sentence imposed on his codefendant violated his jury trial and due process rights.

We modify the sentence to correct a section 654 sentencing error and otherwise affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

### The Charged Offenses and Allegations

Defendant and codefendant Julia Fox[2] were charged with first degree burglary involving the residence of victim Robert Hill (§ 459 (count one)); first degree robbery (§ 211 (count two)); assault with a firearm (§ 245, subd. (a)(2) (count three)); assault with a deadly weapon, namely a knife (§ 245, subd. (a)(1) (count four)); and conspiracy to commit robbery (§ 182, subd. (a)(1)) (count five)).  In addition, defendant was charged with being a felon in possession of a firearm (§ 12021, subd. (a)(1) (count six)).

In connection with counts one, two, three, and four, it was alleged that both defendants personally inflicted GBI (§12022.7, subd. (a).

In connection with counts one and three, it was further alleged that defendant personally used a firearm under section 12022.5, subdivision (a) and in connection with count two, it was alleged that defendant personally used a firearm under section 12022.53, subdivision (b).  In connection with count two, the information alleged against

---

[2]  Fox is not a party to this appeal.

Fox that a principle was armed with a firearm (§ 12022, subd. (a)(1) and in connection with counts two and four, it alleged that she personally used a deadly weapon, namely a knife (§ 12022, subd. (b)(1)).

It was also alleged that the robbery charged in count two was committed by defendants who entered a structure acting in concert (§213, subd. (a)(1)(A)).

Lastly, it was alleged that defendant sustained a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12) and a prior serious felony offense conviction (§ 667, subd. (a)).

**Prosecution Evidence**

At trial, the victim testified he managed a storage company and lived in an apartment above the business. Fox was the victim's methamphetamine supplier.[3] The victim also testified that prior to the day on which the charged crimes occurred, he sent Fox a text message in which he had offered to pay her money if she performed oral sex on him. Fox replied, "[O]kay," but never showed up and one to two weeks went by before the victim saw her next.

Around 8:00 p.m. on November 18, 2010, the victim received a text message from Fox. The text indicated she was getting off the freeway near his home, about five minutes away. He was a little surprised to hear from her. He had not invited Fox to visit that night and she had not asked to visit. When she arrived, he let her vehicle in through the facility gate and met her outside his garage door. He looked into her vehicle and did not see anyone else inside. Fox carried a backpack with her. Fox asked the victim if he would like to smoke methamphetamine with her and she also said she needed to charge her cell phone. The two walked up the stairway in the garage and entered the victim's apartment.

---

**3** The victim testified under a grant of use immunity.

3

While Fox was seated in the victim's living room, she was looking at her cell phone and possibly pushing buttons. She asked the victim to clean his pipe, and he went into the kitchen and then the bedroom to do so. Fox told him she had to get something out of her car. As the victim was drying the pipe with a blow-dryer in his bedroom, he was surprised to see a man, later identified as defendant, masked by a red bandana, appear in the bedroom doorway, pointing a gun at the victim's head. Using the victim's first name, defendant ordered the victim to lay face down on his bed with his hands behind his back. Defendant threatened to "blow [the victim's] fucking head off" if he did not comply. As the victim laid down on the bed, defendant asked whom the victim had disrespected, then asked, " 'Who is the girl that came here tonight?' " The victim replied that it was Fox, and defendant said, " 'That's who you disrespected.' " Defendant repeatedly threatened to "blow [the victim's] fucking head off," and the victim felt the gun press against his head.

At some point, defendant climbed on the victim's back. From this position, defendant beat the victim on the back of the head with an object.

The victim could hear Fox walking around the bedroom, rummaging through drawers. He also heard her doing the same thing briefly in the living room. Fox went from one dresser to another in the bedroom. The victim asked Fox what was going on. She commented about the victim having offered her money to perform oral sex upon him. She was "pissed off" about that, but had not previously said anything to the victim about it. At the time she made that comment, she was going through the dresser drawers. Fox grabbed the victim by the hair, lifted his face up and sprayed him in the eyes with mace or pepper spray. She then started "beating down on" the victim's face with her fist. At some point, the victim lost consciousness. The victim testified, "I think I got knocked out pretty quick . . . ." When asked whether he had been "knocked out" before or after he was maced, the victim indicated he had been going in and out of consciousness and thought that after he was maced, he was "knocked out again or something."

4

When the victim regained consciousness, he charged defendant, who was blocking the bedroom doorway. The victim said there was a "massive struggle" to get out of the house. At the time of the struggle, the victim was "half unconscious." He did not recall seeing Fox at that time. The victim ran down the stairs, but the garage door had been barred by a rod, he described as a stiff piece of wire that was half the size of a pinky finger tip in diameter, bent in a U-shape. He had previously fashioned this rod to lock the garage door, but did not remember closing the garage door when Fox came in. He had to stop to remove the rod. As the victim lifted the garage door, he was struck on the head from behind with a hard object and his knees went weak, but he was able to escape. He ran to a gym located across the street and collapsed in its doorway. He then noticed for the first time that he was bleeding, with blood pouring out of his stomach. He thought he had been shot because he had seen a gun, but had not seen a knife and did not recall being stabbed. He did not remember being struck in the abdomen area. The gym staff called 911. While waiting for the ambulance, the victim slipped in and out of consciousness.

A stipulation was read to the jury that the victim "was transported to [the hospital] where he was treated for a stab wound to his abdomen. [He] suffered and was treated for injuries to his colon and a lung [due] to the stabbing. [He] also received sutures to his face and right hand due to lacerations. [He] did not receive treatment for any injuries to his eyes. [He] remained in the hospital for 6 days prior to release." There was no mention of blunt force injuries in the stipulation.

Upon returning home, the victim discovered his laptop, cell phone, and banking bag were missing.

The jury was shown recordings from surveillance video at the storage unit. The recordings showed: A dark SUV arrived at 8:10 p.m. and entered the gate at 8:12 p.m.; Fox entered through the garage at 8:13 p.m.; the garage door reopened and a male subject entered at 8:18 p.m.; the garage door reopened and the victim ran out at 8:23 p.m.; a few seconds later the male subject exited and ran towards the main gate but then turned and

walked back, reentered the garage at 8:24 p.m., then exited again holding what appeared to be a handgun; Fox ran from the garage holding the backpack at 8:24 p.m.; and the SUV left at 8:25 p.m.

Cell phone records showed calls and texts from Fox's phone. About a minute before the male entered the victim's apartment, a text was sent from Fox's phone to defendant's phone which read, "Win i tex u ur gona hav to rush the door as soon as i open it." Both phones were "pinging" off the same cell tower about a half-mile from the crime scene.

At 8:49 p.m., about half an hour after the assault, a text was sent from Fox's phone to a different number stating, "Im going to prison babe im scard." Between 8:53 p.m. and 12:47 a.m., Fox texted a different number: "I need u to get me now plz i fuked up" and "[i]ts 911 for real." A responding text said, "Baby im all the way in l.a visiting my moms julia." Another text from Fox's phone said: "Omg i think i killed him." The response asked who and if everything was okay. Fox texted, "No no its not." Her correspondent advised, "Okay wipe the place dwn an get out mama." Fox replied, "Its to late for dat im out." Her correspondent then said, "Man its never to late to clean away evidence." Fox said, "Yea it is win muther fkr leakn every were runing down street scream n n he no my name." This prompted a query, "Jesus christ why you hit him in the head."[4] Fox replied, "I stabbed him several times." Her correspondent responded, "Dam thats wut he get for putn his hands on u lol karma." Fox reported it happened "at his business" and "[t]here were cameras," and "[i]t went realy bad im tryn to tell u." Her friend asked why it went bad. She replied, "Does it realy matter i gota go." In the days after the assault, a number of calls were made from defendant's phone to Fox's phone.

---

[4] Fox later testified that she had spoken briefly with this friend. She said she started to tell the friend what happened and then defendant walked into the room.

6

## Defense Evidence

Fox testified. She denied sending the text message " 'OMG, I think I killed him.' " She admitted she sent the text message, " 'I stabbed him several times' " but claimed it was a typographical error, and she meant to text, "J stabbed him several times," referring to defendant James Peacock. Fox admitted sending text messages to friends about going to prison and "fuck[ing] up really bad" but claimed they were prompted by her fear that she would go to prison for not calling 911.

Fox testified that she had known the victim for about four years and had worked odd jobs at his storage facility. He had talked about making her assistant manager. Fox supported herself by selling methamphetamine and had previously sold the drug to the victim. Fox and defendant were "associates" who had known each other since childhood and at one time had a sexual relationship.

Fox testified that on the night in question, defendant gave her a ride to visit a friend in jail, but when they arrived she was unable to visit because all of the visiting appointments had been booked. While she was at the jail, she called the victim, who wanted her to bring him methamphetamine and talk about her employment situation. Defendant agreed to take her there but asked her to drive because he was not feeling well. At the victim's apartment, Fox got a weird vibe from the victim, who had previously asked her for sexual favors and to move in with him. The victim pulled out a pipe but she asked him to clean it because it was dirty. As he cleaned the pipe in the kitchen, he leered at her and made sexual comments about a "blow job." She testified that she went into the victim's stepson's bedroom to look for a cigarette lighter and texted defendant because she was concerned about the victim's behavior which had escalated to attempts to "grab on me and stuff." Fox said this was the text message in which she mentioned rushing the door, and she was referencing the garage door in the event she had to flee the apartment. She said she wanted defendant there to protect her if the victim chased her outside.

7

Fox testified that the victim "started grabbing on my, my butt and trying to grab my crotch from behind." She spun and tried to push him away, but he got more aggressive. She tried to "mace" him with pepper spray but it bounced off his eyeglasses and just made him mad. He pushed her on the bed, grabbed at her breasts, and tried to undo her pants. She used her knee as leverage trying to push him back, and she hit him in the face with her left hand to knock the glasses off his face. He stumbled back. She maced him. He called her a "stupid fucking bitch." She ran down the stairs and opened the garage door. Defendant was standing there with a gun in his hand. She had not known he had a gun with him. Defendant ran up the stairs. Fox stood frozen. She heard the victim screaming. She ran upstairs and saw defendant holding the victim face down on the bed. Defendant asked her what had happened, and she said the victim tried to rape her. Defendant commanded the victim to utter the name of the woman he had disrespected. Fox said she did not call 911 because she was afraid defendant would do something to her, or she might get in trouble because she was there to sell drugs, and she did not want to lose her children.

Fox said she went into the downstairs office to look for the manual override switch to open the main gate. She found the switch but, before she could push it, she heard "really horrible, horrible screaming," and saw defendant come downstairs with his gun in one hand and a knife in his other hand. There was "blood all over." She knew defendant always carried a knife but had not seen it that evening. She denied ever handling that type of knife. As defendant came downstairs, he told her to go get the victim. She was dumbfounded. Defendant ran after the victim. Fox ran to the truck but then returned upstairs to retrieve her backpack. She removed a PlayStation from the backpack and left it there. She returned to their vehicle. She testified that the backpack did not contain any of the victim's property when she left. Defendant drove them away from the scene. Defendant asked Fox if the victim knew defendant's name; Fox said no.

8

Fox testified that defendant took her to his friend's home. When defendant left the truck to see if his friend was home, Fox used her phone to try to get help but no one believed her. At the friend's home, defendant said he needed Fox's phone and took it for a couple of minutes. Fox made up an excuse about a drug transaction and went home by herself.

Fox denied ever talking to defendant about assaulting or stealing anything from the victim.

Defendant presented an alibi defense. He testified he was never at the crime scene. He had a day job installing alarm systems and had a part-time business as a tattoo artist. At the time of the charged crimes, he was doing a tattoo at a "tattoo party" in the apartment of client Heather Shamblin.[5]

Defendant testified Fox was an "old acquaintance" he rarely saw. He once helped her find a place to stay when she was having problems with drugs and had her children taken away from her. On the afternoon of November 18th, she phoned him and said she knew someone who wanted a tattoo. She called back ten minutes later and asked defendant to give her a ride to the jail. Around 3:00 or 4:00 p.m., he picked her up in the vicinity of Fulton and Edison, drove her to the jail, let her borrow his cell phone, dropped her off at the jail, and drove to his home, forgetting Fox had his cell phone.

Defendant testified he was not driving his "Ford Chevy Blazer" that day, because it had been in an accident on November 4th. The SUV was drivable, but he rarely drove it. On the day in question, he was driving a Honda car borrowed from his cousin/roommate. When he got home after dropping off Fox at the jail, his SUV was missing. He did not file a police report, thinking someone may have taken it to a mechanic for him. Yet he acknowledged he was upset about his missing vehicle, as

_____

[5] According to defendant, the party consisted of Shamblin and some children, with some people stopping by for tattoos.

attested by his wife Brandi Marcum, who was his girlfriend at the time. He and Brandi drove the Honda to Shamblin's apartment. He did not pay attention to the clock. Defendant spent time discussing and drawing the design of the tattoo and checking the Honda for his cell phone, which was missing. He used Brandi's phone to call his own but heard no ringing. It was dark outside when he started tattooing. It took a long time, longer than it would have in his shop. During the tattooing, he took two or three breaks, went outside, smoked cigarettes, and relaxed his hands. After completing the tattoo, defendant and Brandi went to a friend's home, smoked marijuana, left about a half hour later and went home. Defendant could not sleep because his stomach was bothering him. Days later, defendant's SUV reappeared at his house. He said his phone and another phone, which he was unfamiliar with, were inside of the SUV.

Shamblin testified she did not know defendant or his girlfriend personally but hired him as a tattoo artist. He arrived in a Honda just before dark on November 18, 2010, between 5:30 p.m. and 7:00 p.m. They discussed and he drew the design for the tattoo, which took about an hour and a half. They took a cigarette break, and Shamblin prepared something for her son to eat. Defendant then did the tattoo, which took about three or four hours, stopping once for a five or ten minute cigarette break. Defendant was at Shamblin's home for about six hours total and left around midnight, give or take 20 minutes.

Brandi Marcum testified in sync with defendant's testimony. She said they left their home around 4:30 p.m. and arrived at Shamblin's apartment around 5:30 or 6:00 p.m. Defendant did not leave the apartment complex but did step outside a couple of times for cigarettes. A tattoo like that would probably take about two hours, but it was really hectic in the home, with people stopping by. Marcum and defendant left Shamblin's apartment around 11:00 or 11:30 p.m., went to a friend's house for about 20 minutes, and then went home. They went to bed, but defendant got up and left the bedroom. She fell asleep.

10

## Verdicts and Sentencing

The jury returned verdicts finding defendant guilty of first degree burglary with personal use of a firearm and personal infliction of GBI (count one); not guilty of first degree robbery, but guilty of petty theft as a lesser offense (count two); guilty of assault with a firearm with personal use of a firearm and personal infliction of GBI (count three); guilty of assault with a deadly weapon, a knife, with personal infliction of GBI (count four); not guilty of conspiracy to commit robbery (count five); and guilty of being a felon in possession of a firearm (count six).[6]

Defendant admitted a prior strike and serious felony conviction from December 1997 for attempted voluntary manslaughter.

The trial court sentenced defendant to an aggregate term of 31 years 4 months, calculated as follows:  The upper term of six years for first degree burglary, doubled to 12 years for the prior strike, plus the upper term of 10 years for the section 12022.5 firearm enhancement, and three years for the section 12022.7 GBI enhancement; a consecutive 16-month sentence for felon in possession of a firearm (one-third the midterm doubled for the prior strike); and a consecutive five-year term under section 667, subdivision (a).[7]  The trial court suspended imposition of sentence on the petty theft and assault counts and enhancements, noting the court was convinced defendant went to the

---

[6]  The jury found codefendant Fox guilty of first degree burglary in which a principal was armed with a firearm and in which Fox personally inflicted GBI (count one); not guilty of first degree robbery but guilty of the lesser offense of petty theft (count two); guilty of assault with a firearm with personal infliction of GBI (count three); guilty of assault with a deadly weapon, a knife, with personal infliction of GBI and personal use of the knife (count four); and not guilty of conspiracy to commit robbery (count five).

[7]  The trial court sentenced Fox to a total of five years, calculated as follows: the low term of two years for first degree burglary plus the low term of three years for the GBI enhancement, with imposition of the firearm enhancement stayed and a concurrent 60-day sentence for petty theft.  The court stayed "[t]he terms of imprisonment" on the assault counts under section 654.

apartment to assist Fox and assault the victim, and the assault and weapons use were all connected to that continuous transaction associated with the burglary.

## DISCUSSION

## I.  Sufficiency of Evidence

Defendant argues the evidence was insufficient to prove he (1) personally inflicted great bodily injury (GBI) or (2) perpetrated or aided and abetted petty theft.  We disagree.

" 'The standard of appellate review for determining sufficiency of the evidence is settled.  " 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence . . . .' " ' " (*People v. Howard* (2010) 51 Cal.4th 15, 33.)  "Under the substantial evidence rule, we must presume in support of the judgment the existence of every fact that the trier of fact could reasonably have deduced from the evidence.  [Citation.]  Thus, if the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment." (*People v. Medina* (2009) 46 Cal.4th 913, 924, fn. 2.)

## A.  Personal Infliction of GBI

Defendant argues the only injuries qualifying for the GBI enhancement (§ 12022.7[8]) were the *stab* wounds, and there was no evidence he inflicted any of the stab wounds, all of which were inflicted by Fox.  However, the stab wounds were not the only injuries.  Defendant personally beat the victim on the head with a gun, and the victim lost

---

[8]  Section 12022.7 provides in part:  "(a) Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years. . . .  [¶] . . .[¶]  (f) As used in this section, 'great bodily injury' means a significant or substantial physical injury."

consciousness, even before Fox stabbed the victim.  The loss of consciousness supports the section 12022.7 finding against defendant.[9]

The trial court instructed the jury that great bodily injury means "significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm." This instruction was correct.  (§ 12022.7, subd. (f), fn. 8, *ante*; CALCRIM No. 3160; *People v. Cross* (2008) 45 Cal.4th 58, 63 (*Cross*).)

Whether harm amounts to GBI is a question of fact for the jury.  (*Cross, supra*, 45 Cal.4th at p. 64 [pregnancy without medical complications that results from unlawful but nonforcible sexual conduct with a minor can support a GBI finding].)  GBI is a substantial injury beyond that inherent in the offense, but "to be significant or substantial the injury need not be so grave as to cause the victim ' "permanent," "prolonged," or "protracted" ' bodily damage." (*Ibid*.)

GBI under section 12022.7 is " ' "essentially equivalent" ' " to "serious bodily injury" under the felony battery statute (§ 243, subds. (d), (f)(4)[10]), which specifies "loss of consciousness" as an example of serious bodily injury.  (*People v. Wade* (2012) 204 Cal.App.4th 1142, 1149-1150, citing *People v. Burroughs* (1984) 35 Cal.3d 824, 831, overruled on another ground in *People v. Blakely* (2000) 23 Cal.4th 82, 89.)  In *Wade*, the defendant choked his girlfriend with so much pressure that she blacked out.  (*Wade*, at p. 1146.)  She did not know for how long she was unconscious.  (*Ibid*.)  Her daughter came to the victim's room, and they yelled at the defendant until he left.  (*Id*. at pp. 1146-

---

[9]  We do not rely on the People's speculative theory that defendant may have also stabbed the victim.

[10]  Section 243, subdivision (f)(4), states, " 'Serious bodily injury' means a serious impairment of physical condition, including, but not limited to, the following:  *loss of consciousness*; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement." (Italics added.)

13

1147.)  The victim had bruises on her neck for a week, but the choking did not impair her neck mobility, and she did not seek medical treatment.  (*Id*. at p. 1147.)  The *Wade* court upheld the felony battery conviction, rejecting the defendant's argument that medical treatment was essential to a finding of serious bodily injury.  (*Id*. at pp. 1147-1150.)

Here, defendant acknowledges there was evidence that his beating of the victim's head with the gun caused the victim to lose consciousness.   The severity of this injury is apparent in that the victim's unconsciousness was so deep that he was unaware he was being stabbed with a knife.

Defendant argues the loss of consciousness was not of sufficient duration to constitute GBI.  He notes section 12022.7, as initially enacted (Stats. 1976, ch. 1139, § 306), listed examples of GBI, including " ' "[p]rolonged loss of consciousness." ' " Defendant quotes from *People v. Nava* (1989) 207 Cal.App.3d 1490, that GBI "must be a significant and substantial injury as contrasted with injuries that could logically be described as constituting only transitory and short-lived bodily distress that do not fall within the contours of injuries that are severe and protracted."  (*Id.* at p. 1496 [concluding that the trial court erred in instructing jury that bone fracture was GBI as matter of law], citing *People v. Johnson* (1980) 104 Cal.App.3d 598, 609.)  Defendant argues the loss of consciousness in this case was "necessarily momentary" rather than prolonged, because the surveillance video showed defendant was at the crime scene less than five minutes, which included the time elapsed climbing the stairs, entering the bedroom, etc.

However, defendant's interpretation of the timeline does not show the loss of consciousness was necessarily momentary.  In any event, there is no duration test as urged by defendant.  Before section 12022.7 became operative, the Legislature (§12022.7, as amended by Stats. 1977, ch. 165, § 94, p. 679) deleted the specified examples of GBI and changed the definition of GBI from " 'serious impairment of physical condition' " to " 'significant or substantial physical injury.' " (*People v. Escobar* (1992) 3 Cal.4th 740, 747; *People v. Caudillo* (1978) 21 Cal.3d 562, 581.)  In

14

*Caudillo*, the court reasoned that the apparent legislative intent of the deletion was not to lessen the magnitude of bodily injury required, but rather to preclude the possibility that the listed examples would be viewed as all-inclusive. (*Id*. at p. 582.) The *Caudillo* court held a "transitory and short-lived" injury did not constitute GBI. (*Id*. at p. 588.) That wording was subsequently applied as a litmus test in some appellate cases such as those cited by defendant here. However, our high court in *Escobar* later held "*Caudillo* erred in concluding that the Legislature intended no change in the definition of 'great bodily injury' when it discarded the specific criteria set forth in the original version of section 12022.7 and substituted the more general 'significant or substantial physical injury' test then in use. Clearly, the latter standard contains no specific requirement that the victim suffer 'permanent,' 'prolonged' or 'protracted' disfigurement, impairment, or loss of bodily function." (*Escobar*, at pp. 749-750.) The *Escobar* court concluded that GBI under section 12022.7 need not meet any particular standard for severity or duration, but need only be a substantial injury beyond that inherent in the offense itself. (*Escobar*, at pp. 746-747; see also *People v. Le* (2006) 137 Cal.App.4th 54, 58-60.)

Here, there was sufficient evidence from which the jury could conclude the victim's loss of consciousness from the beating inflicted by defendant was a significant and substantial injury constituting GBI.

### B. Substantial Evidence of Petty Theft

Defendant argues there was no evidence he took any property and therefore his guilt must be predicated on aiding and abetting the theft by Fox, yet there is insufficient evidence he aided and abetted the theft. He emphasizes the jury was not instructed on a "natural and probable consequences" theory. We conclude the evidence was sufficient to support a finding that defendant aided and abetted the theft without regard to the theory of natural and probable consequences.

A person aids and abets commission of a crime when he promotes, encourages, or instigates the commission of the crime, by act or advice, with knowledge of the

15

perpetrator's unlawful purpose, and with the intent or purpose of committing, facilitating, or encouraging the crime. (*People v. Hill* (1998) 17 Cal.4th 800, 851.) Advance knowledge of the principal's criminal purpose is not required. (*People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 742.) Whether the defendant aided and abetted a crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences from the evidence are resolved in favor of the judgment. (*People v. Mitchell* (1986) 183 Cal.App.3d 325, 329.)

Here, there was evidence that defendant held the victim at gunpoint in the bedroom, while the victim heard Fox moving around the apartment, opening and closing drawers. Indeed, the victim heard Fox going through drawers in the bedroom while his head was down and defendant was on top of him in the very same room. He also saw Fox go from one dresser to another in the bedroom. Given defendant's presence, he was clearly aware of Fox's activities in the bedroom while he was on top of the victim, holding him at gunpoint. Further, since the victim heard Fox going through drawers elsewhere in the apartment while defendant held him captive in the bedroom, it can be inferred that defendant heard Fox's activities also. And defendant later stood in the doorway to the bedroom while the victim was unconscious and attempted to block the victim's escape while Fox was apparently elsewhere in the apartment.

Defendant argues he did not take any property; he did not utter any words to Fox about taking property; and the victim's testimony established that defendant was concerned *only* with the victim having disrespected Fox by sexually affronting her. However, the evidence clearly shows that defendant facilitated the taking of property with the knowledge that Fox was looking for items to take. And it could further be inferred from the evidence that both the assault and the theft were payback for the sexual affront.

Substantial evidence supports defendant's theft conviction.

## II. Jury Instruction on Personal Infliction of Great Bodily Injury

Defendant argues the trial court prejudicially erred by instructing the jury on " 'group beating,' " which supposedly allowed the jury to find he personally inflicted GBI based on the stab wounds inflicted by Fox. Defendant asserts there was no evidence he inflicted any of the stab wounds, and therefore he views his GBI enhancement as being improperly based on vicarious liability for stab wounds inflicted by Fox. (*People v. Cole* (1982) 31 Cal.3d 568, 571 [GBI enhancement cannot be based on aiding and abetting liability].) Defendant's claim of instructional error ignores the fact, as discussed *ante*, that loss of consciousness was also GBI.

We reject defendant's claim of instructional error, because the evidence showed that Fox "beat down" on the victim's face with her fists around the same time the defendant beat the victim with the gun and the victim lost consciousness. Furthermore, the instruction expressly stated it applied only if the jury could not decide which defendant caused which injury.

The trial court instructed the jury, with no objection by the defense: "If you conclude that more than one person assaulted [the victim] *and you cannot decide which person caused which injury* [italics added], you may conclude that the defendant personally inflicted great bodily injury on [the victim], if the People have proved that: [¶] 1. Two or more people, acting at the same time, assaulted [the victim] and inflicted great bodily injury on him on her; [¶] 2. The defendant personally used physical force on [the victim], during the group assault; [¶] AND [¶] 3. The physical force that the defendant used on [the victim] was sufficient in combination with the force used by the others to cause [the victim] to suffer great bodily injury. [¶] The defendant must have applied substantial force to [the victim]. If that force could not have caused or contributed to the great bodily injury, then it was not substantial. [¶] The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved." (Italics added.)

17

Defendant argues this instruction allowed the jury to find the GBI enhancement true as to both defendants based on the acts of the other, by finding that each defendant applied force to the victim, knowing the other defendant was also applying force, and the cumulative effect of their actions produced GBI. We disagree. By its own terms the "group beating" instruction applied only if the jury could not determine which defendant inflicted which injury. And the court instructed the jury that some instructions may not apply, depending on the jurors' findings about the facts of the case. We presume the jurors followed these instructions. (*People v. Prince* (2007) 40 Cal.4th 1179, 1295.)

Here, again defendant argues that the stab wounds were the only wounds constituting GBI. We have rejected that theory. Loss of consciousness was also GBI. The evidence showed that Fox personally inflicted the stab wounds. But the evidence also shows that defendant personally inflicted the loss of consciousness in the bedroom, although Fox could have contributed to that injury when she punched the victim in the face. Beyond that, there *was* additional injury that could have been difficult to attribute to only one defendant, in that the victim lost consciousness again when he collapsed outside the gym across the street, after being beaten on the head with the gun in the bedroom, then stabbed with the knife, and then hit on the head again from behind as he fled from the garage.

The instruction was proper. We reject defendant's claim of instructional error.[11]

---

[11] On appeal, defendant does not contend the prosecutor committed misconduct during closing argument, nor could he do so, having failed to object in the trial court. (*People v. Tully* (2012) 54 Cal.4th 952, 1045.) Thus, we need not discuss the prosecutor's comments about the instruction during closing arguments.

18

### III. Sentencing Factors in Aggravation

Defendant argues the trial court relied on improper factors in aggravation when it imposed the upper term on both the burglary and the firearm enhancement. We conclude the contention lacks merit.

### A. Background

At the sentencing hearing, defense counsel argued it would be an improper dual use of facts to rely on violence and bodily harm to impose the upper term, because those factors were subsumed by the GBI and personal use of a firearm enhancements. The prosecutor responded he was seeking the upper term based on the surrounding circumstances, not merely on the facts of GBI and gun use.

The trial court began by noting the description of the facts underlying defendant's prior attempted voluntary manslaughter conviction in denying a grant of probation. According to the probation report, the facts underlying this prior conviction were that park rangers were chasing defendant to apprehend him for smoking marijuana. Defendant hid in a creek bed and fired three shots from a pistol at one of the peace officers, hitting him in the chest. The officer was wearing a bullet proof vest. The trial court stated, "[T]he reason I refer to that is your history involves weapons, an assault on a peace officer with a weapon. And had this peace officer, the park ranger not been wearing a bullet proof vest, you might have been convicted for quite a different offense. Not attempted voluntary manslaughter and possibly as serious as murder, but you were not. So you have demonstrated a propensity for violence. [¶] The facts surrounding the offenses before the Court demonstrate that as well." Based on this, the trial court denied probation.

The trial court then selected count one, burglary in the first degree, as the base term and selected the upper term "because of the nature of the offense,[12] the seriousness of the facts surrounding the offense, the cruelty, the violence involved. *And* as I have noted, your propensity to be violent and have used violence in the past against a peace officer in particular. [¶] You are a danger to society. [¶] You have demonstrated that before by firing a weapon at a peace officer. And by engaging in the conduct that you engaged in now, you are lucky you are not here again on attempted murder and/or if this man would have died, on a murder charge. [¶] So those are the reasons the Court selects the upper term, six years." (Italics added.)

The court doubled the six-year upper term for the "prior strike conviction."

In imposing the upper term for the firearm enhancement (§ 12022.5), the trial court said, "[T]he Court again selects the upper term, recognizing that it has the discretion to impose a low term of three or middle term of four. [¶] The Court selects the upper term of ten again, because of the violent conduct involved, the callousness, the viciousness of the offense. [¶] The Court records and transcript will reflect that the victim did testify that he was struck to the head several times by what later turned out to be a solid hard object, i.e., the firearm."

In imposing the three-year GBI enhancement, the court said, "In light of the . . . jury finding that you . . . inflicted . . . [GBI] on the victim, no doubt, pursuant to the

---

**12** Defendant argues the " 'nature of the offense' " cannot be an adequate ground for the upper term, because then the offense would have a built-in aggravating factor in every case. (*People v. Smith* (1984) 155 Cal.App.3d 539, 546.) However, in context, it appears the court was referring to "[f]actors relating to the crime" (Cal. Rules of Court, rule 4.421(a)), which the court then went on to list.

stabbing,[13] and that is the finding pursuant to 12022.7, the Court further enhances the base term by three years."

The trial court further found that there were no factors in mitigation.

### B. Analysis

Defendant argues the trial court improperly relied on his prior conviction to impose the upper term for burglary, double the base term, and impose the section 667, subdivision (a), five-year enhancement. Defendant argues that, while imposition of the two recidivist enhancements was not a prohibited dual use of facts, either of these two combined with imposition of the upper term was a prohibited dual use.

In imposing an upper term, the trial court may consider circumstances in aggravation (*People v. Sandoval* (2007) 41 Cal.4th 825, 848; California Rules of Court, rules 4.420-4.421[14]), including: "**(a) Factors relating to the crime** [¶] Factors relating to the crime, whether or not charged or chargeable as enhancements include that: [¶] (1) The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness; [¶] (2) The defendant was armed with or used a weapon at the time of the commission of the crime . . . . [¶] . . . [¶] (8) The manner in which the crime was carried out indicates planning, sophistication, or professionalism; [¶] . . . [¶] **(b) Factors relating to the defendant** [¶] Factors relating to the defendant include that: [¶] (1) The defendant has engaged in violent conduct that indicates a serious danger to society; [¶] (2) The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness; [¶] (3) The defendant has served a prior prison term . . . ." (Rule 4.421.)

---

[13] We affirm the GBI finding based on loss of consciousness rather than the stab wounds.

[14] Undesignated rule references are to the California Rules of Court.

21

A single aggravating factor will suffice to justify a trial court's discretionary selection of an upper term. (*People v. Black* (2007) 41 Cal.4th 799, 812 (*Black*).) However, the court cannot impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law, unless the court can and does strike the punishment for the enhancement. (§ 1170, subd. (b); rule 4.420(c).)

As for count one, burglary in the first degree, the trial court's findings reflected by its comments during the sentencing hearing related to two factors in aggravation: (1) the rule 4.421(b)(1) factor related to the defendant -- "[t]he defendant has engaged in violent conduct that indicates a serious danger to society"; and (2) the rule 4.421(a)(1) factor related to the crime -- "acts disclosing a high degree of cruelty, viciousness, or callousness." As for the enhancement, the court's comments can be read to relate to the rule 4.421(a)(1) factor related to the crime -- "acts disclosing a high degree of cruelty, viciousness, or callousness."

As for the upper term sentence on count one, the trial court's findings regarding the underlying facts of the defendant's prior conviction was sufficient to aggravate the prison sentence, without reference to the viciousness and callousness of the current offense. (*Black, supra*, 41 Cal.4th at p. 812 [one factor in aggravation is enough].) Defendant contends the trial court violated the dual use prohibition by aggravating his sentence with the fact that he had a prior conviction. We disagree. The court did not use the fact of the prior conviction to justify the upper term sentence; rather, the trial court relied on the degree of violence defendant exhibited in that earlier case. As described in the probation report, defendant ambushed the park ranger and shot him in the chest. But for the fact the ranger was wearing a bulletproof vest, he may have been killed. When interviewed for the probation report in that case, defendant said he and his accomplice did not want to be taken into custody. It was appropriate to consider these facts since they are beyond the facts necessary to establish the conviction offense.

*People v. Castorena* (1996) 51 Cal.App.4th 558 (*Castorena*) is illustrative.  There, the defendant was convicted of gross vehicular manslaughter while intoxicated.  (*Id*. at p. 559.)  After consuming multiple glasses of beer and brandy and achieving a blood alcohol level of .20, the defendant drove at speeds up to 100 miles an hour, including on the wrong side of the road, ran several red lights and narrowly missed injuring several people other than the victim.  This all occurred after defendant was told he was too intoxicated to drive, at one point had his keys taken away from him and was offered other means of transportation.  (*Id*. at pp. 561-562.)  The trial court observed that defendant had acted not with gross negligence, but with implied malice and used the aforementioned facts to impose the upper term sentence.  (*Ibid*.)  On appeal, the trial court's sentencing decision was affirmed.  As the *Castorena* court recognized, "where the facts surrounding the charged offense exceed the minimum necessary to establish the elements of the crime, the trial court can use such evidence to aggravate the sentence.  [Citation.]"  (*Id*. at p. 562.)

So too is the case when a trial court looks to the circumstances of a prior conviction offense in imposing a sentence on an offense a defendant subsequently commits.  Indeed, similar to the trial court's observation in *Castorena* that defendant's conduct there showed implied malice, the trial court here noted that the facts underlying the prior conviction demonstrate attempted murder, not attempted voluntary manslaughter.  Furthermore, the trial court here found that defendant's prior conduct demonstrates a propensity for a high degree of violence.  Its finding relates to the aggravating circumstance in rule 4.421(b)(1), "[t]he defendant has engaged in violent conduct that indicates a serious danger to society."

As for the firearm enhancement, the court again noted that the offense was violent, callous, and vicious, remarking that defendant struck the victim on the back of the head several times with the firearm.  Defendant appears to extend his argument that this

23

conduct was subsumed in the firearm and GBI enhancements to the sentence on the firearm enhancement.  This argument also lacks merit.

Rule 4.428 provides in pertinent part:  "If an enhancement is punishable by one of three terms, the court must, in its discretion, impose the term that best serves the interest of justice and state the reasons for its sentence choice on the record at the time of sentencing."  Here, defendant acted in a gratuitously violent, cruel, and callous manner beyond that inherent in a burglary, firearm, or GBI enhancement.  After ordering the victim at gunpoint to lay face down on the bed, defendant got on top of the victim, pressed the gun to the victim's head, and threatened to "blow [the victim's] fucking head off" and repeated that threat multiple times.  Apart from striking the victim with the firearm, this callous and vicious conduct was sufficient to support the upper term on the firearm enhancement.

On this point, *People v. Douglas* (1995) 36 Cal.App.4th 1681 is illustrative.  There, the defendant was convicted of multiple counts of robbery and attempted robbery and a firearm enhancement was found true.  (*Id.* at p. 1684.)  The trial court's imposition of the upper term on the firearm enhancement was challenged on appeal.  The *Douglas* court wrote, "[F]actors existed beyond that which would result from mere use of the gun itself.  The evidence shows circumstances beyond that which was necessary for finding use of the gun.  [The defendant] did not merely possess or display a handgun.  Instead, after he entered the bar, he pointed it at the victim's face and then, after ordering her to give him the money, he used the gun to threaten her into complying with his request by putting the gun to the side of her head at very close range.  The manner in which he used the gun clearly involved the threat of great bodily harm, which, contrary to [the defendant's] argument, is a factor legally sufficient to justify imposition of the upper term."  (*Id.* at pp. 1691-1692.)  The same analysis applies here.  (See *People v. Collins* (1981) 123 Cal.App.3d 535, 538-539 [upheld aggravated kidnapping term based on viciousness and callousness in addition to gun use enhancement, where defendant held

24

cocked gun to victim's head], criticized on other grounds in *People v. Bravo* (1990) 219 Cal.App.3d 729, 734.)

Moreover, the trial court's findings as to the level of viciousness in this case is similar to the trial court's finding in *Castorena* that the defendant acted not with gross negligence, but rather with implied malice. (*Castorena, supra*, 51 Cal.App.4th at pp. 561-562.) The trial court observed that defendant could have been charged with attempted murder in this case or murder had the victim died from his injuries. Thus, defendant's actions as a perpetrator and also as an aider and abettor of the stabbing (which was apparently facilitated by rendering the victim unconscious) clearly exceeded the minimum necessary to establish the firearm enhancement and the GBI enhancement regarding the the loss of consciousness he caused.

Defendant cites *People v. Alvarado* (1982) 133 Cal.App.3d 1003, which rejected an aggravated sentence based on "great violence/threat of great bodily harm" where the defendant also received a firearm enhancement. (*Id*. at p. 1028.) There, however, the *Alvarado* court concluded that the presence of the firearm was the *only* justification for finding a threat of great bodily harm. (*Ibid*.) *Alvarado* does not help defendant.

Additionally, other aggravating factors appear in the probation report, which could have been cited by the trial court had defendant developed his objections at sentencing, and therefore any dual use error was harmless because it is not reasonably probable that a more favorable sentence would have been imposed in the absence of the alleged dual use error. (*People v. Osband* (1996) 13 Cal.4th 622, 728-729.) The probation report states that "[t]he manner in which the crime was carried out indicates planning, sophistication, or professionalism" (rule 4.421(a)(8)), and the trial evidence showed a level of sophistication and planning. This aggravating factor was available to aggravate the sentence on either count one or the firearm enhancement. The probation report also states defendant was placed on informal supervision as a juvenile on a charge of bringing a .44-magnum revolver to his junior high school. This is another case involving a firearm

25

and demonstrates defendant's proclivity to arm himself with such weapons. Also, defendant has a prior misdemeanor conviction for burglary in March 1996, in which he stole beer from a liquor store and his accomplices struck the store clerk with closed fists. This is another case showing defendant's propensity for acting in concert with others to commit theft.[15]

We reject defendant's claim that the trial court made dual use of aggravating factors in his sentence.

## IV. Claim of Unconstitutional Disparate Sentencing

Defendant claims a "disparate" sentence was imposed against him (31 years 4 months) in comparison to codefendant Fox's sentence (five years), in violation of his federal and state constitutional rights to a jury trial, due process, and equal protection. (U.S. Const., 5th, 6th, 14th Amendments; Cal. Const., art. I, §§ 7, 16, 24.) Notably, defendant does not claim cruel and unusual punishment, though he cites cases on that subject. He does not provide any analysis or authority on due process and equal protection. Defendant's constitutional claim fails.

Assuming for the sake of argument that intracase proportionality review is appropriate, such review examines whether a defendant's sentence is " ' "proportionate to his *individual* culpability, irrespective of the punishment imposed on others." ' " (*People v. Jackson* (1996) 13 Cal.4th 1164, 1246.) "The disparity in sentencing imposed on [the] defendant and [a codefendant] does not establish that defendant's sentence is grossly disproportionate to the offense he committed. Evidence of the disposition of a codefendant's case, as opposed to evidence of the codefendant's complicity and involvement in the offense, is not relevant to the decision at the penalty phase [death sentence], which is based on the character and record of the *individual* defendant and the

---

[15] The trial court considered the fact that defendant had served a prior prison term as a reason for imposing a consecutive sentence on count six, felon in possession of a firearm.

circumstances of the offense." (*People v. Mincey* (1992) 2 Cal.4th 408, 476.) "A sentencing court considers not only the circumstances of the crime, but circumstances individual to each defendant. . . . So long as [the defendant's] sentence was justified by [the defendant's] crimes, individual culpability, and record, the sentence received by an accomplice is not relevant." (*People v. Foster* (1988) 201 Cal.App.3d 20, 27, citation omitted.)

Here, both defendant and Fox were complicit and deeply involved in the assault on the victim. While Fox may have set up the crime, defendant provided the muscle and the firearm. In sentencing Fox, the trial court contrasted defendant's culpability. The court said, it sentenced defendant to "31 years largely because of his criminal history and his violent nature." Defendant presented a very different situation than Fox.[16] He had the additional present conviction (felon in possession of a gun) and prior conviction for attempted voluntary manslaughter of a park ranger, which also involved his use of a firearm. The prior conviction not only doubled defendant's base terms, but also accounted for a consecutive five-year serious felony enhancement. Additionally, defendant's personal use of a firearm added ten years and reflects legislative intent to punish more harshly criminals who personally use guns. (See *People v. Gonzales* (2001) 87 Cal.App.4th 1, 18 [discussing § 12022.53].) Contrary to defendant's assertion that there was no evidence the victim suffered head wounds from being hit with the gun, the victim suffered loss of consciousness from defendant hitting the victim on the head with the gun. Accordingly, the prison sentence imposed by the trial court here can be connected to his individual conduct and prior record.

---

[16] Regarding Fox, the trial court went on to observe, in contrast to defendant, "I don't believe per se that you present a danger to the community. I believe what happened here was what the law refers to as an aberrant or isolated instance. [¶] You've never demonstrated that you're a violent person. In fact, the letters that have been submitted here on your behalf state to the contrary, that you're a loving, caring mother, individual."

Defendant claims that, even factoring in his prior conviction, fairness demands he receive no more than the low term for burglary, doubled, plus the low or middle term for the firearm enhancement. However, defendant fails to show a constitutional violation in sentencing. We reject his reliance on *People v. Dillon* (1983) 34 Cal.3d 441, which found cruel and unusual punishment where a 17 year old with no criminal record received a life sentence for murder while none of his cohorts were sentenced to state prison. (*Id.* at p. 488.) Here, defendant was a 35-year-old adult who committed a violent home invasion and assault and had a prior conviction for attempted voluntary manslaughter of a peace officer, also involving a firearm, in addition to a firearm offense as a juvenile.

Defendant cites *United States v. Bischel* (9th Cir. 1995) 61 F.3d 1429, which said imposition of disparate sentences in itself is not generally an abuse of discretion, but an explanation is required when there is substantial disparity and evidence that the judge is punishing one defendant for exercising his right to stand trial. (*Id.* at p. 1437.) The court in *Bischel* cited *United States v. Capriola* (9th Cir. 1976) 537 F.2d 319, in which the defendants who chose to stand trial received a harsher penalty than co-conspirators who pleaded guilty. The *Capriola* court remanded to permit the trial court to state a reason or ameliorate the sentences. (*Capriola,* at pp. 320-321.) We note that the court in *United States v. Hall* (9th Cir. 1985) 778 F.2d 1427, 1428, said *Capriola* is limited to its facts. And the *Bischel* court saw no reason to remand where the record showed reasons for the harsher sentence, including prior conviction, criminal history, leadership role in the criminal conduct, and absence of evidence that the disparity was due to the defendant exercising his trial rights. (*Bischel*, at p. 1437.)

Here, both defendants went to trial, and therefore the disparity in sentences cannot be attributed to defendant having exercised his right to a jury trial.

We conclude defendant fails to show grounds for reversal.

28

## VII.  Section 654 Sentencing Error

In our review of the sentencing hearing, we discovered an error concerning the sentences for counts three and four, assault with a firearm (§ 245, subd. (a)(2)) and assault with a deadly weapon (§ 245, subd. (a)(1)), and the enhancements associated with those counts.  The court stated: "[T]he Court will stay imposition of any further imposition of sentence pursuant to [] section 654, as the Court finds that the assault on the victim . . . were part of the continuous transaction associated with the burglary for which you were convicted in Count 1.  [¶]  In other words, I am convinced that the reason that you came into the apartment was to assist or come to the aid of [] Fox and to assault the victim . . . and that the use of the firearm, the use of the knife, and the assault, were all connected to that continuous course of criminality and were not independent criminal objectives."

We do not disagree with the trial court's findings that counts three and four and the associated enhancements were subject to section 654.  But as noted, the trial court never imposed sentences on those counts.  The failure to do so was error.

"[W]hen a court determines that a conviction falls within the meaning of section 654, it is necessary to *impose* sentence but to stay the *execution* of the duplicative sentence . . . ." (*People v. Duff* (2010) 50 Cal.4th 787, 796 (*Duff*); see *People v. Alford* (2010) 180 Cal.App.4th 1463, 1469, 1472 (*Alford*); *People v. Niles* (1964) 227 Cal.App.2d 749, 755-756.)  Thus, even though section 654 requires that the sentences imposed on counts three and four be stayed, the trial court was nevertheless required to impose judgment on each count, which involves selecting a term, and then staying execution on these counts, the stay to become permanent upon defendant's service of the portion of the sentence not stayed.  (*People v. Salazar* (1987) 194 Cal.App.3d 634, 640; see *Duff*, at p. 796.)  "This procedure ensures that the defendant will not receive 'a windfall of freedom from penal sanction' if the conviction on which the sentence has not been stayed is overturned.  [Citation.]" (*Salazar*, at p. 640.)  The trial court thus

29

"committed unauthorized sentencing error by failing first to pronounce sentence on [these counts] and then stay execution of [those] sentence[s]." (*People v. Crabtree* (2009) 169 Cal.App.4th 1293, 1327; see *Alford*, at p. 1472.) Because this aspect of the sentence was unauthorized, we reach this issue notwithstanding the fact that it was not raised by either party.

As in *Alford*, we see no reason to remand for resentencing. Rather, we instead exercise our authority to modify the judgment in a way that is consistent with the trial court's sentence on the count that was not stayed. (§ 1260; *Alford, supra*, 180 Cal.App.4th at p. 1473.) As noted, the court imposed an upper term on count one, burglary in the first degree, the upper term of 10 years on the firearm enhancement, the term of three years for the GBI enhancement, and it enhanced the sentence for the prior strike and serious felony allegations. It is clear that the trial court would have imposed an upper term on count three and the firearm enhancement in the absence of count one or it would have imposed the upper term on count four in the absence of count one. And it is equally clear the trial court would have imposed the three-year term for the great bodily injury enhancement and the five-year term for the prior serious felony conviction on counts three and four in the absence of count one.

Accordingly, on count three, assault with a firearm (§ 245, subd. (a)(2)), we impose the upper term of four years doubled to eight years for the strike (§§ 667, subds. (b)-(i), 1170.12), plus 10 years for the firearm enhancement (§ 12022.5, subd. (a)), plus three years for the great bodily injury enhancement (§ 12022.7, subd. (a)), plus five years for the prior serious felony conviction (§ 667, subd. (a)). As to count four, assault with a deadly weapon (§ 245, subd. (a)(2)), we impose the upper term of four years, plus three years for the GBI enhancement (§ 12022.7, subd. (a)), plus five years for the prior serious felony conviction (§ 667, subd. (a)). Execution of the sentences on counts three and four and their associated enhancements shall be stayed pursuant to section 654, the

stay to become permanent upon defendant's service of the sentences on count one and the associated enhancements. (See *Duff, supra*, 50 Cal.4th at p. 796.)

## DISPOSITION

The judgment is modified to: (1) impose a sentence of eight years on count three (upper term of four years doubled for the strike pursuant to §§ 667, subds. (b)-(i), 1170.12), plus the upper term of 10 years for the firearm enhancement (§ 12022.5, subd. (a)), plus three years for the great bodily injury enhancement (§ 12022.7, subd. (a)), plus five years for the prior serious felony conviction (§ 667, subd. (a)); (2) impose a sentence of eight years, on count four (upper term of four years doubled for the strike pursuant to §§ 667, subds. (b)-(i), 1170.12), plus three years for the great bodily injury enhancement (§ 12022.7, subd. (a)), plus five years for the prior serious felony conviction (§ 667, subd. (a)); (3) execution of the sentences on counts three and four and their associated enhancements is stayed pursuant to section 654. The trial court is directed to prepare an amended abstract of judgment reflecting these modifications and forward a copy to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

MURRAY, Acting P. J.

We concur:

DUARTE, J.

HOCH, J.

31